J-S20003-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KEITH CALDWELL | |
| Appellant | No. 630 WDA 2015 |

Appeal from the Order March 3, 2015
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0006929-2007

BEFORE:  PANELLA, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PANELLA, J.                    **FILED APRIL 15, 2016**

Appellant, Keith Caldwell, appeals *pro se* from the order entered March 3, 2015, which denied his second motion for post-conviction DNA testing under Section 9543.1 of the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. We affirm.

On March 12, 2008, a jury convicted Appellant of first-degree murder for the shooting death of his grandfather. This Court affirmed the judgment of sentence on appeal, and the Supreme Court denied allocatur on April 25, 2012. **See Commonwealth v. Caldwell**, 38 A.3d 919 (Pa. Super., filed Nov. 14, 2011) (unpublished memorandum), **appeal denied**, 44 A.3d 1160 (Pa. 2012). Since that time, Appellant has sought relief from his judgment of

_____

[*] Retired Senior Judge assigned to the Superior Court.

sentence by filing three petitions for post-conviction relief, each of which have been unsuccessful. The instant motion is Appellant's second motion for DNA testing. The PCRA court denied Appellant's motion. This timely appeal followed.

Appellant raises the following issues for our review.

1. Judge Randal Todd abused his discretion and erred when he denied the petitioner's motion seeking DNA testing (profiling) based off erroneous, baseless assumption that the Commonwealth conceded through the testimony of Detective Myers that the substance found on evidence in question was in fact the blood of the victim, when in reality the record shows that DNA profiling was never conducted on the sample in question therefore the Commonwealth could not have conceded to a fact that was not yet a fact, and could not/and was not argued to be factual by either party or any expert witness.

2. Judge Randal Todd abused his discretion and erred when he denied the petitioner's motion for DNA testing (profiling) based off erroneous, baseless assumption that the Commonwealth conceded through the testimony of Detective Myers that the substance found on evidence in question was in fact the blood of the victim, when in reality the record show[s] that the Commonwealth never conceded (before the jury), argued or agreed with Detective Myer[']s testimony of blood/saliva being "expelled" when the victim was shot, and in fact later on argued the opposite of Detective Myer[']s testimony arguing quote, blood does not "splatter" or "spurt(ing)" in instant death cases.

3. Judge Randal Todd abused his discretion and erred when he denied the petitioner's motion for DNA testing (profiling) without taken [sic] into consideration that DNA testing would disprove the Commonwealth's baseless theory that, "in instant death cases", "you don't have the splatter or spurting of blood", a theory used to directly discredit th[e] petitioner's trial defense while wearing long-sleeved baggy clothing and did not get a drop of blood of the victim[']s DNA splatter on any of said clothing, which if guilty would have been in the

closest proximity to the wound, literally inches away. DNA testing would scientifically/factually disprove the Commonwealth's rebuttal to this defense, thus proven [sic] actual/factual innocence.

4. Judge Randal Todd abused his discretion and erred when he denied the petitioner's motion for DNA testing (profiling) ruling testing was not "relevant" without taken [sic] into consideration the triers of facts/ the jury, thought said testing was extremely relevant during deliberations when they stopped to ask the court, "where was the envelope, exhibit 23, in relation to the victim's body. Also, were items moved on the table/cooler to pick up the envelope. Was there DNA testing on the envelope and if so, what were the conclusions, if not wouldn't there be further testing." Questions that proved said evidence and testing were not only relevant but very important in the outcome of this case.

Appellant's Brief at 3.

Because post-conviction DNA testing is provided for under the PCRA, "[o]ur standard of review permits us to consider only whether the PCRA court's determination is supported by the evidence of record and whether it is free from legal error." **Commonwealth v. Conway**, 14 A.3d 101, 108 (Pa. Super. 2011) (citation omitted). We additionally recognize that the PCRA's one-year jurisdictional time bar does not apply to motions for the performance of forensic DNA testing under Section 9543.1. **See Commonwealth v. Brooks**, 875 A.2d 1141, 1146 (Pa. Super. 2005). As such, there is no jurisdictional impediment to our review.

We review an order denying a motion for post-conviction DNA testing as follows.

[T]he trial court's application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law. When reviewing an order denying a

- 3 -

motion for post-conviction DNA testing, this Court determines whether the movant satisfied the statutory requirements listed in Section 9543.1. We can affirm the court's decision if there is any basis to support it, even if we rely on different grounds to affirm.

*Commonwealth v. Williams*, 35 A.3d 44, 47 (Pa. Super. 2011) (internal citations omitted).

Regarding the post-conviction DNA statute, we observe that

[t]he statute sets forth several threshold requirements to obtain DNA testing: (1) the evidence specified must be available for testing on the date of the motion; (2) if the evidence was discovered prior to the applicant's conviction, it was not already DNA tested because (a) technology for testing did not exist at the time of the applicant's trial; (b) the applicant's counsel did not request testing in a case that went to verdict before January 1, 1995; or (c) counsel sought funds from the court to pay for the testing because his client was indigent, and the court refused the request despite the client's indigency. Additionally, … [u]nder section 9543.1(c)(3), the petitioner is required to present a prima facie case that the requested DNA testing, assuming it gives exculpatory results, would establish the petitioner's actual innocence of the crime. Under section 9543.1(d)(2), the court is directed not to order the testing if it determines, after review of the trial record, that there is no reasonable possibility that the testing would produce exculpatory evidence to establish petitioner's actual innocence. From the clear words and plain meaning these provisions, there can be no mistake that the burden lies with the petitioner to make a prima facie case that favorable results from the requested DNA testing would establish his innocence. We note that the statute does not require petitioner to show that the DNA testing results would be favorable. However, the court is required to review not only the motion for DNA testing, but also the trial record, and then make a determination as to whether there is a reasonable possibility that DNA testing would produce exculpatory evidence **that would establish petitioner's actual innocence**. We find no ambiguity in the standard established by the legislature with the words of this statute.

*Id*. at 49-50 (citation omitted; emphasis in original).

Instantly, Appellant has failed to meet the threshold requirements for DNA testing under Section 9543.1(a)(2). The blood sample on the envelope at issue was discovered before Appellant's trial in 2008, the DNA testing technology was available at the time of Appellant's trial in 2008, the verdict was rendered after January 1, 1995, and there is no evidence that the trial court refused funds for DNA testing. **See** 42 Pa.C.S.A. § 9543.1(a)(2).

We further note that the PCRA court assessed Appellant's request for DNA testing in light of the trial record to see if there were a reasonable possibility that the testing would produce exculpatory evidence to establish Appellant's actual innocence. **See** 42 Pa.C.S.A. § 9543.1(c)(3) and (d)(2). The PCRA court ultimately concluded that Appellant failed to set forth a prima facie case that the requested DNA testing would establish his actual innocence. **See** PCRA Court Opinion, 7/20/15. After reviewing the briefs of the parties, the certified record and the applicable law, we agree.

Having concluded that the PCRA court's July 20, 2015 opinion ably and comprehensively disposes of Appellant's issues raised on appeal, with appropriate reference to the record and without legal error, we will affirm on the basis of that opinion. **See id**. (finding that Appellant failed to set forth a prima facie case that the requested DNA testing would establish his actual innocence).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  4/15/2016

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA

v.

KEITH CALDWELL,

    Petitioner

CRIMINAL DIVISION

NO. CC200706929

**OPINION**

Appeal

JUDGE RANDAL B. TODD

COPIES SENT TO:

Counsel of Record for the
Commonwealth of Pennsylvania:

Stephen A. Zappala, Jr.
District Attorney

    By

Michael Streily, Esquire
Assistant District Attorney
401 Courthouse
Pittsburgh, PA 15219

Keith Caldwell, Pro Se
#HP2240
SCI Dallas
1000 Follies Road
Dallas, PA 18612



ORIGINAL
Criminal Division
Dept. of Court Records
Allegheny County, PA.

FILED
2015 JUL 20 AM 11: 37
DEPT. OF COURT RECORDS
CRIMINAL DIVISION PA
ALLEGHENY COUNTY PA

(89)

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) ) ) | CRIMINAL DIVISION |
| | ) | NO. CC200706929 |
| v. | ) ) | |
| KEITH CALDWELL, | ) ) | |
| Petitioner | ) | |

TODD, J.

July 20, 2015

## **OPINION**

This is an appeal by Petitioner, Keith Caldwell, from an order entered on March 3, 2015

denying his "Application Seeking to Conduct Forensic D.N.A. Testing Pursuant to 42 Pa.C.S.A.

§9543.1" which was filed on January 5, 2015.[1]  On April 1, 2015 Petitioner filed a Notice of

Appeal to the Superior Court which contained a Matters Complained of on Appeal which set

forth the following:

1. Judge Randal Todd abused his discretion and erred when he denied the Petitioner's Motion Seeking DNA testing (profiling) based off erroneous, baseless assumption that the Commonwealth conceded through the testimony of detective Myers that the substance found on evidence in question was in fact the blood of the victim, when in reality the record shows that DNA profiling was never conducted on the sample question. Therefore the Commonwealth could not have conceded to a fact that was not yet a fact, and could not/and was not argued to be factual by either party or any expert witness.

---

[1] Petitioner was convicted of first degree murder on March 12, 2008 for the shooting death of his grandfather. Petitioner's judgment of sentence was affirmed by the Superior Court on November 14, 2011. His Petition for Allowance of Appeal was denied by the Supreme Court on April 5, 2012. Petitioner's judgment became final on July 4, 2012. Petitioner filed his first *Pro Se* PCRA Petition on December 5, 2012, which was denied without a hearing on June 28, 2013. The Superior Court affirmed the dismissal of the PCRA Petition by Memorandum Opinion filed July 15, 2014.

1

2. Judge Randal Todd abused his discretion and erred when he denied the Petitioner's motion seeking DNA testing (profiling) based off the erroneous, baseless assumption that the Commonwealth conceded through the testimony of Detective Myers that the substance found on the evidence in question was in fact the blood of the victim, when in reality the record show that the Commonwealth never conceded (before the jury), argued or agreed with Detective Myers testimony of blood/saliva being "expelled" when the victim was shot, and in fact later on argued the opposite of Detective Myers testimony arguing quote blood does not "splatter" or "spurt(ing)" in instant death cases.

3. Judge Randal Todd abused his discretion and erred when he denied the Petitioner's motion seeking DNA testing (profiling) without taken into consideration that DNA testing would disprove the Commonwealth's baseless theory that, "In instant death cases", "you don't have the splatter or spurting of blood", a theory used to directly discredit the Petitioner's trial defense that he could not shoot a high-powered handgun, at contact range, while wearing long – sleeved baggy clothing and not get a drop of the victim's DNA splatter on any of said clothing, which of guilty would have been in the closest proximity to the wound, literally inches away. DNA testing would scientifically/factually disprove the Commonwealth's rebuttal to this defense, thus proven actual/factual innocence.

4. Judge Randal Todd abused his discretion and erred when he denied the Petitioner's motion seeking DNA testing (Profiling) ruling testing was not "relevant" without taken into consideration the triers of facts /the jury, thought that said testing was extremely relevant during deliberations when they stopped to ask the court, "Where was the envelope, Exhibit 23, in relation to the victim's body. Also were items moved on the table/cooler to pick up the envelope. Was there DNA testing on the envelope and if so, what were the conclusions, if not why wouldn't there be further testing." Questions that prove said evidence and testing were not only relevant but very important in deciding the outcome of the case.

**BACKGROUND:**

This matter arises out of Petitioner's conviction on March 12, 2008 of first degree murder in the shooting death of his grandfather. The procedural and factual history of this case is set

forth in the 1925(b) opinion of January 18, 2011. The following are excerpts from that opinion relevant to this appeal:

An autopsy performed by Dr. Michael Panella of the Allegheny County Coroner's Office determined that the victim died of a single gunshot wound to the head with the bullet traversing the brain and lodging in the back of the neck on the left side. (T., p. 33) Dr. Panella opined that the wound was a close contact wound indicating that the shooter had placed the gun directly against the victim's skull when firing the gun. The bullet was retrieved and found some ballistic examination to be a .38 caliber bullet that was fired from the victim's .357, the gun was found at the rear of the house. (T., p. 118) (Opinion, pp.4-5)

During the interview [of Petitioner] Detective Satler noticed what he believed to be a stain on Defendant's right boot and consent was obtained to collect Defendant's boots and clothing. Buccal swabs for DNA testing and a gunshot residue kit were also obtained. (T., p. 178) DNA testing of the gun used in the shooting, Defendant's jacket, Jersey, sweatshirt, shirt and jeans were either negative or inconclusive for blood stains or consistent with Defendant's own blood. (T., pp. 228-238) However, a blood stain on Defendant's right boot matched the victim's blood. (T., p. 239) (Opinion, pp. 6-7)

It is clear that Defendant's counsel argued vehemently that the prosecution's evidence did not point to Defendant as the murder. Defense counsel's arguments include the following: … "the absence of blood splatter on Defendant's other clothing was inconsistent with Defendant holding the gun during a close contact shooting of his grandfather's head. (Opinion, pp. 10-11)

In his closing argument at trial, Petitioner's counsel argued the following:

If, in fact, Keith Caldwell took that gun and held it in close contact to his grandfather's head and pulled the trigger causing the blood splatter, how do you explain that it doesn't get on any of his clothing with the exception of his boot? That is their claim. They are not proving it, but they are claiming that. How do they explain that it is not on his jacket? Maybe he didn't have his jacket on. It's not on the sleeve of his shirt. It's not on the chest area of his shirt. It's not on his pants. They cannot find a smidgen of it. You have blood spraying out and nothing hits him and he's wearing oversized clothing? Does not raise a question in your

3

mind? It should. And that is, ladies, a reasonable doubt. (Tran. Closing Arguments, p. 8)

In response, the prosecutor argued at trial as follows:

> Now, as to the blood evidence in this case, Mr. Forman said, well, ask yourself why there was no blood on his clothing. Dr. Panella was asked if this was an instant death and he said yes. Instant death means the heart stopped pumping. I asked him with that knowledge, would you expect to see a lot of blood. He said, there is blood on the victim, but the heart stopped pumping. You don't have splatter or spurting of blood. (Tran. Closing Arguments, p. 28)

In the instructions to the jury, the following instruction was given:

> "The law requires that *I repeat that the arguments of counsel are not evidence and should not be considered as such*. However, in deciding the case, you are should (sic) carefully consider the evidence in light of the various reasons and arguments lawyer presented. It is the right and duty of each lawyer to discuss the evidence in a manner which is most favorable to the side he or she represents. You may be guided by the lawyers' arguments *to the extent that they are supported by the evidence* and in so far as they aid you when applying your own reason and common sense. However, you are not required to accept the arguments of either lawyer. It is for you and you alone to decide the case based on the evidence as it was presented and in accordance with these instructions." (T., p. 261)

During the Commonwealth's case, Detective Joseph Meyers testified that he arrived at the scene of the shooting at 5:40 p.m. and participated in the investigation inside the apartment. (T., p. 121) Detective Meyers testified concerning the layout of the apartment and also identified various photographs and evidence during the trial. In identifying Commonwealth Exhibit 27, Detective Meyers testified as follows:

> This is an envelope where Nathaniel Caldwell was sitting. Three feet in front of him was a television on a nightstand. And in front of that might stand was a blue plastic cooler on top and a number of over-the-counter medicines. And also a number of envelopes or mail addressed to Mr. Caldwell. This is one of those in. We noticed on a number of envelopes a light pink and light red substance, which

4

we believe would have been blood and/or saliva expelled from his mouth when he was shot. (T., p.128).

Although an objection was entered to the opinion by Detective Meyers that the substance was expelled from the victim's mouth, the testimony that it was the victim's blood or saliva was not stricken and, in addition, Detective Meyers testified that field tests were done at the scene and were positive for the presence of human blood. (T., p. 129)

During deliberations the jury submitted the following question:

> "Where was the envelope, Exhibit 23, in relation to the victim's body. Also, were items moved on the table/cooler to pick up the envelope. Was there DNA testing on the envelope and if so, what were the conclusions. If not, why wouldn't there be further testing." (T., p. 280)

In response the jury was informed that the Commonwealth and defense had rested and that the trial cannot be reopened and they must rely on the evidence admitted during the trial. (T., p. 280)

## DISCUSSION:

Petitioner has filed a motion for DNA testing pursuant to 42 Pa.C.S.A. §9543.1 which provides in pertinent part as follows:

**a) Motion.--**
(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(c) **Requirements.--**In any motion under subsection (a), under penalty of perjury, the applicant shall:
(1) (i) specify the evidence to be tested;
(ii) state that the applicant consents to provide samples of bodily fluid for use in the DNA testing; and

5

(iii) acknowledge that the applicant understands that, if the motion is granted, any data obtained from any DNA samples or test results may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.
(2) (i) assert the applicant's actual innocence of the offense for which the applicant was convicted; and

(3) present a prima facie case demonstrating that the:
(i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and
(ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:
(A) the applicant's actual innocence of the offense for which the applicant was convicted; 42 Pa.C.S.A. § 9543.1

In his motion Petitioner requests DNA testing pursuant to §9543.1 of the blood found on the envelope identified by Detective Meyers and as referred to in the jury's question. Citing the argument of his counsel regarding the fact that there was no blood found on his clothes from blood splatter, despite the fact that this was a "close contact wound," as well as the Commonwealth's argument that there would be no splatter because the heart stopped beating almost immediately, Petitioner states:

> "The petitioner request DNA testing (profiling) be conducted on the blood on the envelopes located in front of where the victim was found murdered to establish his ACTUAL INNOCENCE, if/when the blood proves to be the victims it will factually prove/confirm blood traveled about 3 ft. in the direction the murderer would have bin (sic) standing when the shot was fired thus they would have been covered by this splattering blood." (Petition, p. 7)

However, as noted above, Detective Meyers testified that the pink or red substance on the envelope in question was believed to be blood from the victim and field testing confirmed that it was blood. In addition, there was substantial evidence that there was bleeding from the victim at the time of the shooting. Dr. Panella testified that the path of the bullet was from the right frontal scalp area through the base of the brain, through the left back of the skull and it lodged in

6

the left back of the neck. He further gave the opinion that with a gunshot to the base of the brain, particularly through the brainstem, it results in an almost instantaneous death. In response to the question of when the heart stops beating, he replied that it would be very quickly, "Within a matter of two seconds to two minutes." (T., p. 36) When asked specifically about the amount of blood he testified:

> "You can still get blood from a position of the body. There would be some blood loss just because of the position of the body and the drainage from the wound itself. I believe there was also blood that was coming out of the left ear by the bullet exiting through the left back of the skull. So there would be some blood, but you would detect there would not be a significant amount, as though there were still pumping of the heart. I don't think I can really give you a firm quantitation." (T., p. 36)

Dr. Panella also testified that there were some patches of blood staining over the head, trunk and arms and hands. (T., pp. 37-38) It should be noted that the victim's granddaughter, Valerie Caldwell, also testified concerning her observations of the victim when she found his body. Ms. Caldwell testified as follows:

Q.     Valerie, what did you see on his shirt?

A.      It looked like half of his shirt was wet from here to here (indicating) And then it was still moist and there was pieces of red stuff. To me, it looked like flesh. There were four pieces on his shirt. Then it dawned on me and I saw his tears. He had blood tears, and his mouth was just blood dripping down and that is why I looked and I just scream." (T, p. 16)

Therefore, there was a significant amount of evidence of blood on or about the victim's body, as well on the envelope in question, which the jury could have relied upon in rejecting the Commonwealth's *argument* that there was little bleeding or no splatter, if it chose to do so. In addition, given all of the other direct and circumstantial evidence, there is no basis to believe that

7

the presence or absence of blood was alone dispositive. DNA evidence matching the blood on the envelope to the victim adds little or nothing to the body of evidence in this case and certainly does not prove Petitioner's actual innocence. The fact that the jury may have inquired about DNA testing on the envelope does not indicate that DNA testing is now required.

Petitioner erroneously argues that if DNA was testing was done it and it was confirmed that it was the victim's blood that this would establish his actual innocence on the theory that it would "factually prove" that the blood splattered in the direction "the murderer would have bin (sic) standing when the shot was fired thus they would have been covered by the splattering blood." However, this argument fails because there is no evidence the murderer would have been required to be standing directly in front of the victim in order to fire the fatal shot. The testimony of Dr. Panella concerning the location of the entrance wound and the path of the bullet from the top of the head to the base of the skull, as well as the fact that the victim was seated when he was shot, could suggest that the murderer was not standing directly in front of the victim when the shot was fired. In addition, the argument could also be made that the clothes that Petitioner was wearing which he turned over to the detectives were simply not the same clothes he was wearing at the time of the shooting, even if he was wearing the same boots.[2] §9543.1(d)(2) provides:

_____

[2] To the extent that Petitioner states in his reply to the Notice of Intent to Dismiss that the Commonwealth's response to his motion references DNA testing of the stain on his boot, it is noted that this is the second motion by Petitioner requesting post conviction DNA testing. In his first motion Petitioner requested retesting of the blood stain on his boot. The Commonwealth responded to that motion and the motion was denied. In response to the instant petition the Commonwealth's response referred erroneously to testing on the blood stain on the boot. The decision in this matter was based on the fact that Petitioner was requesting testing of the blood on the envelope and not the boot.

8

2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual innocence of the offense for which the applicant was convicted; 42 Pa.C.S.A § 9543.1(d)(2)

There was no dispute that the blood on the envelope was from the victim and, in fact, it was the Commonwealth, through Detective Meyers, that offered the evidence that the blood was from victim. In addition, it is clear that there is no reasonable probability that the testing would establish Petitioner's actual innocence. Therefore, the motion was appropriately denied.

By the Court:

_____ J.

9